UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Medtox Laboratories, Inc.,

            Plaintiff,

v.

Gateway Medical Research, Inc.,

            Defendant.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 08-1308 ADM/JJG

___

Darren B. Schwiebert, Esq., James R. Mayer, Esq., and Ted C. Koshiol, Esq., Fredrikson & Byron, PA, Minneapolis, MN, on behalf of Plaintiff.

Kevin M. Decker, Esq., and Maren F. Grier, Esq., Briggs & Morgan, PA, Minneapolis, MN, on behalf of Defendant.

___

## I. INTRODUCTION

On May 12, 2010, the undersigned United States District Judge heard oral argument on Cross-Motions for Summary Judgment of Plaintiff Medtox Laboratories, Inc., ("Medtox") [Docket No. 46] and Defendant Gateway Medical Research, Inc. ("Gateway") [Docket No. 51]. Also pending before the Court is Gateway's Objection [Docket No. 80] to Magistrate Judge Jeanne J. Graham's April 23, 2010 Order [Docket No. 74] denying Gateway's Motion for Leave to Bring Third-Party Claims [Docket No. 41] and Medtox's Motion to Strike [Docket No. 75].

Medtox's Complaint [Docket No. 1] asserts claims against Gateway for breach of contract, unjust enrichment, and account stated, arising out of an agreement between Medtox, Gateway, and Tris Pharma, Inc. ("Tris") to conduct a study of a drug. For the reasons set forth herein, Medtox's motion for summary judgment is granted, Gateway's motion for summary judgment is granted in part (unjust enrichment and account stated) and denied in part (breach of contract), Gateway's objection is overruled, and Medtox's motion to strike is denied.

## II. BACKGROUND[1]

Medtox provides testing services to physician offices, clinical trials sponsors, occupational health clinics, pain management clinics, and other health care organizations. Compl. ¶ 1. Gateway is a clinical research company that specializes in bio-equivalence testing of generic drugs. Id. ¶ 3; Answer [Docket No. 6] ¶ 4. Tris is a pharmaceutical company that researches and develops drug delivery technologies. Compl. ¶ 2.

On November 14, 2007, Medtox, Gateway, and Tris entered into two contracts ("the Agreements"), whereby Medtox and Gateway agreed to conduct a study of a drug for which Tris intended to seek approval by the Federal Drug Administration ("FDA"). Id. ¶ 5; Schwiebert Decl. [Docket No. 49], Exs. A, B (Agreements). One of the contracts governed the study of patients who were fed before taking the drug ("the fed study") and the other governed the study of patients who fasted before taking the drug ("the fasting study"). Compl. ¶ 5. Paragraph three of both Agreements set forth a "Total Study Fee," which was to pay for the clinical work and statistical analysis to be performed by Gateway, as well as the analytical work to be performed by Medtox. Id. ¶ 3(a). The Agreements set a total study fee of $216,800 for the fed study, and $189,980 for the fasting study. Id. In addition, the Agreements established a payment schedule that required Tris to pay Gateway a first payment in the amount of 40% ($86,720 for the fed study and $75,992 for the fasting study) of the total study fees before the studies began, a second payment of 40% when Medtox received the clinical samples, and a third payment of 20% when Tris received the final report from Gateway. Id. ¶ 3(b). Finally, the Agreements provided that

---

[1] On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995). As both parties have moved for summary judgment, any disputed facts are noted.

"[Gateway] shall be responsible [to] transfer to [Medtox] that portion of the total fees received from [Tris] due for analytical analysis rendered according to the following payment schedule: [$99,000 for the fed study/$85,800 for the fasting study] . . . upon [Gateway's] receipt of [the] second payment from [Tris]." Id. ¶ 3(c).

On January 25, 2008, Gateway sent invoices to Tris for the second payments on each study. Schweibert Decl., Ex. E. at 3-4. On May 1, 2008, a Gateway director sent an email to a Tris manager and a Medtox director stating that Gateway had contacted Tris "several times" regarding the January 25, 2008 invoices but that Gateway still had not received any payment. Id. at 1. The next day, the Tris manager responded that she had "signed off these invoices and forwarded them to accounts payable for payment." Id., Ex. F at 1. Tris sent a check dated July 20, 2008, to Gateway, paying $31,088 of the $86,720 called for in the fed study and $28,188 of the $75,992 called for in the fasting study. Id., Ex. G, H. There is no dispute that Gateway received these partial payments from Tris. Id., Ex. J at 2-4.

Medtox initiated this action against Gateway and Tris, claiming that it had not been paid for its analytical services in breach of the Agreements. Tris pleaded counterclaims, alleging, inter alia, that Medtox was negligent and in breach of its obligations under the Agreements for using inadequate controls and unacceptable bio-analytical procedures. On January 19, 2010, the Court granted Medtox and Tris's joint motion to dismiss their claims against each other with prejudice [Docket Nos. 36-37]. The pending cross-motions for summary judgment followed.

### III. DISCUSSION

**A.**     **Summary Judgment Standard**

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall issue "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. Ludwig, 54 F.3d at 470. The nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

### 1. Effect of the Medtox/Tris Settlement

Gateway argues that Medtox's claims against Gateway and Tris were for a "single, indivisible injury" of not being compensated for the analytical work it performed in the drug study for Tris. Def.'s Mem. in Supp. of Summ. J. [Docket No. 53] at 14. When Medtox settled with Tris, Gateway contends, that claim for compensation was satisfied in exchange for Tris's release of its counterclaims against Medtox. Thus, Medtox cannot maintain its claims against Gateway on the same theory and for the same damages, which would constitute a double recovery.

In support of its position, Gateway argues that Tris was the party that was primarily liable to Medtox for the payments and that Gateway was only secondarily liable to Medtox. Thus, Medtox's release of claims against Tris for primary liability necessarily released its claims against Gateway for secondary liability.

4

Gateway's argument is rejected because this action does not raise questions of primary and secondary liability. Tris and Gateway had different contractual responsibilities governed by the Agreements. Tris's obligation was to submit a second payment to Gateway when Medtox received the clinical samples from Gateway; Gateway's obligation was to pay Medtox its entire portion of the total study fees for the analytical work as soon as Gateway received the second payment from Tris. Although Gateway's obligation to Medtox was conditioned on Tris satisfying its obligation of submitting a second payment to Gateway, it does not follow that Tris is primarily liable to Medtox and that Gateway is only secondarily liable to Medtox. Their liability for breach of contract, if established, turns on different conduct that breached different contractual obligations. Secondary liability is defined as "[l]iability that does not arise unless the primarily liable party fails to honor its obligation." Black's Law Dictionary 933 (8th ed. 2004). Although Gateway's obligation to pay Medtox was conditioned on Tris performing its obligation of paying Gateway, it is not correct to argue that Gateway's liability arises, if ever, ***only*** if Tris is liable. Quite the contrary, in a hypothetical where Tris paid Gateway the total study fees and Gateway failed to pay Medtox, Gateway's liability for breach would have arisen in the absence of Tris's liability.

Gateway also argues that should Medtox prevail on its claim against Gateway for failing to pay Medtox upon the receipt of the second payment from Tris, Gateway will then have an in-kind claim against Tris for the damages Gateway is forced to pay to Medtox as a result of Tris's withholding from the second payment the amounts that were to pay for Medtox's work. Gateway contends that because Medtox agreed in its settlement with Tris to indemnify Tris for any damages paid as a result of Gateway asserting claims against Tris, an impermissible

"circuity of obligation" will arise such that Medtox ultimately would be paying its own damages. Gateway has not asserted a claim against Tris for indemnification of any damages Gateway is forced to pay to Medtox as a result of Tris's conduct, much less prevailed on a such a claim. Because no circuity of obligation exists at this time, it would be premature to hold that Medtox's claims against Gateway fail because they give rise to a potential, impermissible circuity of obligation.

### 2. Breach of Contract

Both Medtox and Gateway move for summary judgment on Medtox's breach of contract claim. "The elements of a breach of contract claim under Missouri law are: (1) a contract between the plaintiff and the defendant; (2) rights of the plaintiff and obligations of the defendant under the contract; (3) breach of the contract by the defendant; and (4) damages suffered by the plaintiff." Amburgy v. Express Scripts, Inc., 671 F. Supp. 2d 1046, 1055 (E.D. Mo. 2009) (quotations omitted).[2]

As a threshold matter, Gateway contends that it owed no valid contractual obligations to Medtox due to a lack of consideration. Gateway argues that although consideration between Medtox and Tris and between Gateway and Tris existed under the Agreements, there was no consideration between Gateway and Medtox. The argument is unavailing. Tris agreed to pay Gateway the total study fees for the conduct of the drug study. In exchange for Medtox's agreement to perform the analytical aspect of the study, which enabled Gateway to perform the statistical analysis, complete the study, prepare a "Clinic Report," and collect the total study

---

[2] The Agreements select Missouri law to govern the construction and interpretation of the contractual language. Schwiebert Decl., Exs. A, B ¶ 10.

fees, Gateway agreed to "be responsible for the transfer to [Medtox] that portion of the total fees received from [Tris]" that was due for Medtox's work on the drug study. Agreements ¶ 3(c). The benefit to Gateway that constitutes consideration supporting Gateway's obligation to transfer payment to Medtox is the work that Medtox performed. While Medtox's work ultimately benefitted Tris, it also benefitted Gateway, which could not complete its aspects of the study, and thus earn the total study fees, without Medtox's analytical work.

Whether Gateway breached its contractual obligations to Medtox turns on the interpretation of the contractual language in paragraph 3(c) of the Agreements, which sets forth the payment schedule. The construction and interpretation of a contract is a question of law. Sligo, Inc. v. Nevois, 84 F.3d 1014, 1019 (8th Cir. 1996) (citing Central City Ltd. v. United Postal Sav. Ass'n, 903 S.W.2d 179, 182 (Mo. Ct. App. 1995)). Whether the language of a contract is ambiguous also is a question of law. Id. A contract is ambiguous if, considering the whole instrument and giving words their ordinary and natural meaning, the terms are "susceptible of more than one meaning so that reasonable persons may fairly and honestly differ in their construction. Id. If no ambiguity exists, the contract is construed and enforced according to its plain meaning. Id. However, when a contract is ambiguous, it is construed against the drafter. John Deere Co. v. Hensley, 527 S.W.2d 363, 365 (Mo. 1975).

Gateway contends that its contractual obligation to transfer fees to Medtox is triggered only if the second payment that Tris submitted to Gateway was acknowledged by Tris as including amounts due for Medtox's analytical work. Although Tris submitted the second payment to Gateway, Tris rejected Medtox's performance and specifically withheld from its second payment to Gateway the exact amount of fees that would be owed for the work

7

performed by Medtox.  Therefore, Gateway concludes, its obligation to transfer fees paid for Medtox's analytical work was not triggered.

Medtox reads the provisions of the Agreements differently.  Medtox argues that paragraph 3(c) unambiguously requires Gateway to collect the total study fees from Tris and, upon receipt of Tris's second payment, transfer to Medtox that portion of the total study fees owed to Medtox.  Medtox concludes that because Gateway sent Tris an invoice for the second payment and Tris submitted that second payment, albeit only a partial payment, Gateway's obligation to transfer the portion of the total fee to which Medtox was entitled to under the Agreements was triggered.

Paragraph 3(c) provides that Gateway "shall be responsible for the transfer to [Medtox] that portion of the total fees received from [Tris] due for analytical analysis rendered . . . upon [Gateway's] receipt of [the] second payment from [Tris]."  Gateway construes the provision as conditioning its obligation to pay on whether or not Tris specified or declared that its payment to Gateway included amounts for fees "due for analytical analysis rendered."  However, the plain language of the Agreements does not clearly impose such a condition on Gateway's obligation to Medtox.  Gateway's proposed interpretation would be more tenable if the word "due" were replaced with the word "paid."  In other words, had the provision read that Gateway shall be responsible for transferring to Medtox "that portion of the total fees received from Tris *paid* for analytical analysis rendered," Gateway could correctly assert its obligation was not triggered if Tris had designated that its payment did not cover amounts for analytical analysis.

Gateway's argument assumes that determining whether fees are "due" turns on whether Tris has given its approval of Medtox's analytical analysis.  But the language of the Agreements

8

does not support the assumption. The timing for the completion of work in the Agreements contemplates that the fees were due when Gateway received the second payment from Tris, which under the Agreements was required to occur upon delivery of the clinical samples to Medtox and before any analytical work was performed. Thus, the plain language of the Agreements does not contemplate a situation in which Tris is permitted to withhold a portion of the payment to Gateway, thereby permitting Gateway to withhold payment to Medtox, until Tris reviews the work performed by Medtox and determines that it is acceptable.

Nevertheless, even if Gateway's proposed construction were reasonable, the awkwardly worded provision in paragraph 3(c) is fraught with ambiguity, being susceptible of more than one reasonable construction. Paragraph 3(c) fails to explain the process by which the parties are to determine when fees are "due for analytical analysis rendered," which is necessary to determine whether Gateway's obligation to pay Medtox was triggered. The plain meaning of the word "rendered" conveys that the analytical work by Medtox has been completed and presented or submitted to Gateway before payment is transferred to Medtox. See The American Heritage Dictionary 1477 (4th ed. 2000) (defining "rendered" as meaning "[t]o submit or present, as for consideration, approval, or payment"). However, such a reading cannot be reconciled with other language in paragraph 3(c) that indicates that payment to Medtox is triggered by Gateway's "receipt of the second payment from [Tris]," which occurs upon Medtox's "receipt of the clinical samples"—an event that necessarily occurs before any analytical analysis is performed. Thus, paragraph 3(c) suggests that the transfer of payment to Medtox occurs before any analytical analysis has been performed, but at the same time, suggests that the transfer occurs after the analytical analysis has been completed and presented to Gateway. In the face of such ambiguity,

9

the Agreement must be construed against the drafter.  See Triarch Indus., Inc. v. Crabtree, 158 S.W.3d 772, 776 (Mo. 2005) (en banc).  The undisputed testimony is that Gateway drafted the Agreements.  See Schwiebert Decl., Ex. C (Unwin Dep.) 10:11-12:21, 19:2-25.  The language of the Agreements, therefore, does not contemplate that Gateway can justify its failure to pay Medtox for its analytical analysis because Tris did not approve of the quality of Medtox's work.

Finally, Gateway maintains that Medtox has not suffered damages because it has "been made whole" on its breach of contract claims "by obtaining [Tris's] release of its multi-million dollar counterclaim."  Def.'s Mem. in Supp. of Summ. J. at 27.  Therefore, "[p]ermitting Medtox to maintain this action against Gateway would result in a windfall to Medtox as any damages Medtox allegedly suffered have been more than satisfied pursuant to its settlement with [Tris]."  Id.  Gateway reasons that Medtox's claims against Tris and Gateway "involved the same causes of action brought to recover the same damages for the same services rendered to [Tris]."  Id.  As explained previously, however, Medtox's breach of contract claim against Gateway is of a different character from its contract claim against Tris, alleging different conduct that breached different obligations owed to different parties under the Agreements.  Tris's obligation was to pay Gateway the total study fee.  Medtox was obligated to perform the analytical analysis and, in exchange for that work, Gateway was obligated to pay Medtox a designated portion of the fees it received from Tris.  That Gateway ultimately found itself in the precarious position of being caught in a dispute between Tris and Medtox regarding the quality of Medtox's analysis and having to decide whether to pay Medtox despite Tris's apparent refusal to pay for that work is a product of Gateway's own making in drafting and agreeing to the language in the Agreements.

**3.     Unjust Enrichment**

Gateway argues that Medtox's unjust enrichment claim fails as a matter of law because the rights of the parties are governed by a contract. Medtox responds that because a lack of consideration places the enforceability of the Agreements in dispute, dismissal of the unjust enrichment claim is premature. However, Medtox acknowledges that if it is determined that the Agreements are enforceable, then its remedy lies in breach of contract, not unjust enrichment. As explained above, see supra III.A.2, Gateway's lack of consideration argument is without merit, and, accordingly, no dispute regarding the enforceability of the Agreements remains. Dismissal of Medtox's unjust enrichment claim at this time is therefore warranted. See Krupnick & Assocs., Inc. v. Hellmich, 378 S.W.2d 562, 569-80 (Mo. 1964) ("[E]xpress contract would also preclude the existence of the contract implied by law or quasi contract . . . ."); Owen v. Gen. Motors, Corp., No. 06-4067-CV-C-NKL, 2006 WL 2808632, at *2 (W.D. Mo. Sept. 28, 2006) (noting that although a party may, under Missouri law, plead both breach of express contract and unjust enrichment, it may not simultaneously recover damages on both claims).[3]

**B.    Gateway's Objection**

Nearly two months after Medtox and Tris settled their claims against each other, Gateway moved for leave to assert third-party claims against Tris. In her April 23, 2010 Order, Judge Graham denied Gateway's motion, concluding that Gateway had not shown that it pursued its third-party claims against Tris with due diligence and, therefore, good cause to amend the pretrial scheduling order pursuant to Federal Rule of Civil Procedure 16(b) to allow Gateway to plead its claims against Tris was lacking.

---

[3] Medtox indicated in its briefing of the summary judgment motions that it is withdrawing Count V of its Complaint for account stated. Pl.'s Mem. in Opp'n to Mot. for Summ. J. [Docket No. 64] at 29. Accordingly, that claim is dismissed as well.

A motion regarding third-party practice is a nondispositive motion. LR 7.1(a). The standard of review applicable to an appeal of a magistrate judge's order on a nondispositive issue is extremely deferential. Reko v. Creative Promotions, Inc., 70 F. Supp. 2d 1005, 1007 (D. Minn. 1999). The district court must affirm an order by a magistrate judge unless it is "clearly erroneous or contrary to law." Fed. R. Civ. P. 72(a). "A finding is 'clearly erroneous' when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Chakales v. Comm'r of Internal Revenue, 79 F.3d 726, 728 (8th Cir.1996). "A decision is 'contrary to the law' when it 'fails to apply or misapplies relevant statutes, case law or rules of procedure." Knutson v. Blue Cross & Blue Shield of Minn., 254 F.R.D. 553, 556 (D. Minn. 2008) (quoting Transamerica Life Ins. Co. v. Lincoln Nat'l Life Ins. Co., 592 F. Supp. 2d 1087, 1093 (N.D. Iowa 2008)).

Gateway argues that Judge Graham erred by confining her good cause evaluation to whether Gateway exercised due diligence in pursuing its third-party claims against Tris. Gateway contends that the Eighth Circuit has held that "[d]elay alone is insufficient to deny a motion to amend." Dennis v. Dillard Dep't Stores, Inc., 207 F.3d 523, 525 (8th Cir. 2000) (quotation omitted). However, Dennis is inapposite because the issue there was whether an amendment to the *pleadings* under Federal Rule of Civil Procedure 15(a) should have been granted. Id. The issue in this case is whether an amendment to the *scheduling order* under Rule 16(b) should have been granted. The Eighth Circuit has emphasized that "[t]he interplay between Rule 15(a) and Rule 16(b) is settled in this circuit. . . . Rule 16(b)'s good-cause standard governs when a party seeks leave to amend a pleading outside of the time period established by a scheduling order, not the more liberal standard of Rule 15(a)." Sherman v.

12

Winco Fireworks, Inc., 532 F.3d 709, 716 (8th Cir. 2008) (quotation omitted); see also Koehn v. Indian Hills Comty. College, 2003 WL 1823509, at *1 (S.D. Iowa April 2, 2003) (recognizing that delay alone is not sufficient to deny leave to amend under Rule 15(a) but "[t]he equation changes when a scheduling order deadline for the amendment of pleadings is implicated" and the primary measure of good cause in that situation is the party's diligence—i.e., lack of delay—in complying with the scheduling order).[4]

Judge Graham reasoned that even accepting Gateway's contention that it had no reason to pursue its third-party claims against Tris until Tris was dismissed on January 19, 2010, pursuant to its settlement with Medtox, Gateway "did not immediately move to rejoin Tris to the litigation, but instead waited until the last day for nondispositive motions," nearly two months after Tris's dismissal. April 23, 2010 Order at 3. Therefore, Judge Graham determined that Gateway failed to exercise due diligence. Gateway argues that during the two-month delay, it was reviewing discovery to determine whether Medtox's claims against Gateway would necessitate Gateway to assert claims against Tris. Thus, Gateway insists that its "consideration of whether to bring additional parties before the Court is not a lack of diligence." But Gateway offers no specific explanation in support of its conclusory statement, and, accordingly, the Court concludes that Gateway has failed to demonstrate that Judge Graham's determination was clearly erroneous or contrary to law.

**C.     Motion to Strike**

---

[4] Bank of the West v. Estate of Leo, relied on by Gateway, also is unavailing. There, the decision whether to permit a third-party claim to be asserted was analyzed solely under Federal Rule of Civil Procedure 14(a), there is nothing in the opinion to suggest that the scheduling order was in any way implicated, and Rule 16(b) is not even mentioned. 231 F.R.D. 386 (D. Ariz. 2005).

Medtox moves to strike the affidavit of Ketan Mehta ("Mehta"), an employee of Tris, on the grounds that the affidavit is untimely under Local Rule 7.1(b)(1)(D), Mehta was not identified in Gateway's Federal Rule of Civil Procedure 26(a) disclosure as being an individual likely to have discoverable information, and the statements in Mehta's affidavit are inconsistent with the deposition testimony of Tris's Federal Rule of Civil Procedure 30(b)(6) designee. None of the statements in the Mehta affidavit affected the determination of the issues raised in the parties cross-motions for summary judgment or Gateway's objection, and, therefore, the motion to strike is moot.

## IV.  CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED**:

1. Medtox's Motion for Summary Judgment [Docket No. 46] is **GRANTED**;

2. Gateway's Motion for Summary Judgment [Docket No. 51] is **GRANTED IN PART** and **DENIED IN PART**, and the claims against Gateway in Counts IV and V are **DISMISSED**;

3. Gateway's Objection [Docket No. 80] to Judge Graham's April 23, 2010 Order [Docket No. 74] is **OVERRULED**; and

4. Medtox's Motion to Strike [Docket No. 75] is **DENIED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

BY THE COURT:

s/Ann D. Montgomery

_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated: August 2, 2010